[Pottinger v. Hecksher.]

MIDDLE DISTRICT, HARRISBURG, 1855.

## Pottinger *versus* Hecksher. •

1. A delivery of coal to F. & M. as agents of W., would be in law a delivery to W., if they were his agents for that purpose.

2. If a *transit* is once at an end, the delivery is complete, and the *transit* cannot commence again, because the goods are sent to a new and ulterior destination.

3. If a party to whom goods are delivered, is clothed with a general and unlimited power to receive them and alter their destination, the.transit ends when they reach his hands, as between vendor and vendee.

4. If an agent be clothed only with specific and limited authority, to forward goods to a particular destination, the *transitus* is not at an end until the goods have reached the place named by the buyer to the seller, as such destination.

5. If the vendor of the coal had a right of stopping it *in transitu*, he may maintain his action of trespass against the sheriff, for selling it on an execution against his vendee.

6. If a plaintiff and defendant fraudulently combine to enable the defendant to purchase goods on credit from a third party, upon which the plaintiff immediately levies, no title passes, and the vendor may avoid the sale.

7. The single-handed rascality of a defendant, in purchasing goods, knowing of his insolvency, and intending not to pay, would not avoid the sale; there must have been an artifice fitted to deceive the vendor. Per JONES, P., Common Pleas, approved by the supreme Court.

8. A fraudulent confession of a judgment, and a conspiracy between the plaintiff and defendant, to enable him to purchase goods from a third person on credit, for plaintiff to levy on, does not avoid the judgment as between the plaintiff and defendant. Per LOWRIE, J.

ERROR to the Court of Common Pleas of *Berks county*.

Jonathan Wright, who lived in Lebanon county, near Jonestown, had been dealing with Richard Hecksher, of Schuylkill county, before 1852. On the 12th of February, 1852, Hecksher sold to Wright 300 or more tons of coal, at $2 per ton, at Schuylkill Haven, in exchange for flour. Hecksher was to ship the coal at Schuylkill Haven, by Reading Railroad to Reading, for Wright, to Wright's consignee, to be named thereafter. The coal was to be sent first, and the flour was to be delivered at Hecksher's store or mines in Schuylkill county, when the Union Canal opened; not later, however, than the 1st of May, 1852. The following papers were signed by the parties as their contract, each party taking the one signed by the other:

"Richard Hecksher has this day agreed to ship for me 250 tons or more of W. A. lump coal at $2 per ton, at Schuylkill Haven, less 5 per cent. for waste, against which coal I agree to deliver good, sound, fresh ground flour at said R. H. mines or store, at such prices as said R. H. may be able to buy good flour from other good flour dealers, at the times of delivery, which is to be

[Pottinger *v.* Hecksher.]

at the opening of the Union Canal, but not later than the 1st of May. I guarantee the flour to be as above stated, and if it should not turn out as such, willing to take it back or exchange it.

"February 12, 1852.　　　　　　　　　　　　J. WRIGHT."

" 250 to 300 tons lump coal to be sent to Reading by railroad for Mr. Jonathan Wright, to a firm to be given us by him, at $2 per ton at Schuylkill Haven, less 5 per cent. for waste, against which 250 tons or any amount shipped by us, Jonathan Wright will deliver *good, sound and fresh* ground flour to me, at my mines or store, at such prices as I can buy from other good flour dealers flour at the time of delivery, which is to be at the opening of the Union canal.. Mr. Wright guarantees the flour to be good, and take back if any should turn out not as above stated.

" RICHARD HECKSHER.

" Freshville, February 12, 1852."

On the 20th of February, 1852, Wright made an arrangement with Frees & Mull, at Reading, to receive his coal at Reading, cart it to their wharf and provide wharf-room for it on the canal, and then send it to Lebanon county as soon as the Union canal opened. The next day Wright wrote to Hecksher as follows :—

" Reading, February 21, 1852.

" *Richard Hecksher, Esq.*—Dear Sir :—I am at Reading, and have arranged about my coal with Messrs. Frees & Mull to receive them and attend to them, also I have arranged with the railroad company. Now I want you to send me the 300 tons as soon as you possibly can. Send them as much together as possible, as they are prepared to take them away from the shutes as fast as they come ; and I presume they want to keep their carts going when they begin ; you will direct them to Frees & Mull, Reading, and the reason I want them right off, is, while our teams from Lebanon are hauling grain and flour to Reading, they will expect coal in a day or two from this time, as I told them you would send as soon as I ordered. When these are done, if I see I can arrange for more, I will perhaps take more. I have written my friends at Harrisburg, also Mr. Benet, in regard to the matter we spoke about when I saw you. I expect to be at Harrisburg next week.

" Yours, with respect,

" J. WRIGHT.

" Please answer to Jonestown P. O., Lebanon Co., on reception of this."

Hecksher commenced sending coal from Schuylkill Haven to Reading, to Jonathan Wright to the care of Frees & Mull, on the 9th of March, 1852, and continued to do so almost every day during the month of March, and on the 2d, 3d, 5th and 6th of April; the coal sent the last four days was about 90 tons.

The way bills and tickets brought down with the coal, consigned it to Jonathan Wright, care of Frees & Mull at Reading. When the coal arrived at Reading, the tickets were delivered to Frees & Mull; the coal was dumped into shutes that were marked Frees & Mull, they having rented the shutes from the Reading Railroad Company, under a special arrangement, for Wright's coal.

Frees & Mull commenced carting the coal from out of the shutes to their wharf, and continued to do so while the coal was brought down to Reading and dumped into the shutes. Part was still in the shutes when the sheriff levied on the coal. Frees & Mull paid the freight on the coal, and for the use of the shutes, to the Reading Railroad Company. Wright had also purchased coal from McDonald—that was brought down the Reading railroad about the same time—that was also in the care of Frees & Mull, and dumped into the same shutes. McDonald's coal and Hecksher's were mixed. Hecksher had nothing to do with the shutes into which the coal was dumped, neither with the wharf, to which a part was taken, nor was he to pay any freight, after the coal left Schuylkill Haven. When the contract was made, no other place where the coal was to be sent, was named than Reading, to a firm to be named thereafter. Hecksher knew not what was to be done with the coal after it reached Frees & Mull, at Reading, other than what he may have learned from Wright's letter of the 21st of February, 1852.

About the 8th or 9th of March, 1852, Wright had four wagon-loads of coal hauled from Frees & Mull's wharf to Lebanon.

On the 2d of April, 1852, Jacob Light entered up judgment in Berks county, against Wright, and issued a _fi. fa._ on the same day, which _fi. fa._ came to the sheriff's hands at ten minutes before ten o'clock, A. M. On the same day, the sheriff levied on the coal at the Railroad, and the coal on the wharf of Frees & Mull. Some of the Hecksher coal arrived at Reading on the 2d, 3d, 5th and 6th of April—this coal was also dumped into the shutes marked Frees & Mull, with the exception, perhaps, of three, four, five or six cars of coal; being probably the cars that came down on the 6th of April.

On the 7th of April, 1852, Mr. Strong, with Hecksher, and for him, gave notice to the agent of the railroad, where part of the coal still remained, that he claimed the coal for Hecksher,

[Pottinger *v.* Hecksher.]

as his—he gave the same notice to the sheriff, and also to Frees & Mull, as to all the coal at the railroad and on the wharf.

On the 9th of April, Light gave his bond of indemnity to the sheriff, and on the 19th of April, 1852, the sheriff sold the lot of coal on the wharf to Jacob Light for $700, and the lot at the railroad to Frees & Mull for $300. This last coal was in the shutes at the railroad, when sold by the sheriff.

. In the course of the trial, the plaintiff offered to prove a fraudulent combination between Jacob Light and Jonathan Wright, to get the coal from Richard Hecksher into their possession; the defendant objected to the evidence, the court overruled the objection, and admitted the evidence. Defendant excepted, (and this is the only bill of exceptions to evidence.)

On the trial, defendant asked the court to instruct the jury as follows:

"1. That Frees & Mull were the agents of Jonathan Wright, for the purpose of receiving the coal at Reading, and that they were not the agents of Richard Hecksher, for any purpose whatever.

"2. That a delivery of the coal to Frees & Mull, the agents of Jonathan Wright, was in law a delivery to Jonathan Wright himself.

"3. That after the coal was brought to Reading, and deposited or dumped into the shutes of the Reading Railroad Company, and a part taken away by Frees and Mull to their wharf, the coal was in the possession of Frees & Mull.

"4. That the plaintiff, Richard Hecksher, had no such possession of the coal or shutes, as would enable him to maintain this action of trespass against the sheriff, and that, therefore, the plaintiff cannot recover.

"5. That this action against the sheriff, (the defendant,) cannot be sustained; and that all the acts and doings of Jonathan Wright, or Jacob Light, before or after the levy and sale under the execution, do not affect the sheriff in any way to aid the action.

"6. That although Jonathan Wright knew that he was insolvent and unable to pay for the coal, when he made the purchase from Richard Hecksher, and intended not to pay for it, it is not a fraud upon Hecksher, not being communicated to induce him to make the sale, and will not avoid the sale, so as to entitle Hecksher to reclaim the coal, after it was in possession of Wright's agents. That to avoid the sale, Wright must have used artifice intended and fitted to deceive Hecksher, of which there is no evidence in the cause.

"7. That in this case, the right of stoppage *in transitu* is gone, and that, therefore, the plaintiff cannot recover."

The court, (J. PRINGLE JONES, J.,) charged the jury as follows:

[Pottinger v. Hecksher.]

"Jonathan Wright had had dealings with Hecksher before 1852. Light was already indorser and bail for Wright, in the Lebanon and Harrisburg Banks, and to others, exceeding $2000, being embarassed and pressed by a creditor. In January or February, 1852, in conference with that creditor's attorney, he informed him that he had bought, or could, or intended to buy coal, convert it into money and pay off. The attorney gave him time, but finding he could get nothing, brought suit the 2d of February, 1852. The 12th of February, 1852, Wright entered into a contract for 250 tons of white ash lump coal with Hecksher. The cost of the coal was to be $2, at Schuylkill Haven, then it was to be sent to Reading. 18th of February, Light indorsed a note in the Lebanon Bank for Wright for $1000, discounted. On the 20th of February, 1852, Wright saw Frees & Mull and arranged for the reception of the coal. February 21, 1852, letter from Wright to Hecksher, announcing that Frees & Mull would receive the coal at Reading. February 23, 1852, letter, Wright to Mull & Frees, that Hecksher would send 400 tons. March 3, 1852, Light indorsed two notes for $1052. On the 6th of March, 1852, ordered Patton that the coal be shipped to him as quick as possible, and same day wrote to Hecksher.

"Letter on the 8th of March, Wright to Frees & Mull, sending four teams with flour, and they to bring back coal. On the 9th of March, 1852, coal began to be delivered, and was delivered from day to day to 6th of April. March 23, 1852, letter from Wright to Hecksher to send six or eight cars a day—disappointed—could make a good arrangement if he could get the coal now. About 1st of April, sale of the personal estate of Wright in Lebanon county, bought mostly by Light and Wengert. Wright went on as before, retaining possession in the name of Light and Wengert. A few days before the 2d of April, Wright tells Mr. Barclay that a judgment bond would be sent from Kline and Weidman, where the property was to be levied, at the wharf and at the railroad. Instructed Barclay as to the value of the coal, acting as agent apparently of Light.

"April 1, 1852, Wright gave judgment to Light for $1990. Entered 2d of April. Same day another judgment for $199, entered April 1st. Same day another judgment for $2686, entered April 1st. Same day he gave a judgment to Light and Wengert for $497. Wright was clearly insolvent it is evident. April 2d, 1852, levy in Berks county, at the suit of *Light v. Wright*, and Light indemnified the sheriff. April 9th, letter from Wright to Hecksher, not to send more coal—professed friends were tearing him to pieces—come after him like the hawks of destruction. April 9th, same kind of letter to Frees

& Mull.  April 19th, sheriff's sale in Berks county.  Wright at the sale.  Light buys the coal.

"1.  Frees & Mull were certainly designated by Wright's letter of the 21st of February, 1852, to Hecksher, as his agents, for such purposes as are mentioned in that letter, and in the counterpart agreement of the 12th of February, 1852, signed by Hecksher.  Hecksher was to send 250 tons of coal to Reading, (agreement of 12th of February, 1852, signed by Jonathan Wright,) and by agreement signed by Hecksher, to be sent to Reading by railroad for Jonathan Wright, to a firm to be given us by him.  Frees & Mull being indicated, Patton says he sent the coal mentioned in the tickets, to Frees & Mull, Reading, on account of Jonathan Wright.

"It is a question of fact, whether Frees & Mull were the agents of Jonathan Wright, and for what purposes.  They seem to have been agents of Jonathan Wright to receive the coal at Reading, though as a fact in the cause it is for the jury.  They do not seem to have been the agents of Hecksher.

"2.  A delivery of the coal to Frees & Mull, in Reading, as the agents of Jonathan Wright, would be in law a delivery to Jonathan Wright, if they so far represented him, as to make a delivery to them a full, effectual and final delivery to Wright, as contra-distinguished from a delivery to them acting as a mere medium of transit towards Wright.  Cross on Liens, 372.

"If the transit is once at an end the delivery is complete, and the transit cannot commence again, merely because the goods are again sent to a new and ulterior destination.

"When by arrangement an intermediate delivery occurs, before the goods reach their ultimate destination, it is to be enquired whether the party to whom they are so delivered is invested with power to receive them and to alter their destination, or is a mere agent to see them forwarded, agreeably to original directions.  If clothed with a general and unlimited power, in this respect, the transit ends when goods reach his hands, as between vendor and vendee ; this is the ulterior delivery in view as between them.  It is an actual delivery, not constructive.

"When goods are ordered to be forwarded to A. at X. for the purpose of being shipped to Y., it has been held that at X. they had so far got to the end of their journey, for they then required new orders to put them again in motion, or they must otherwise continue stationary.  It is in the option of the vendee to send them where he thinks proper.  Cross on Liens, 373.

"These coals were sent from Hecksher to Frees & Mull, at Reading, on account of Jonathan Wright.

"If an agent be clothed only with specified and limited authority to forward goods to a particular destination, the *transitus* is not at an end till the goods have reached the place,

named by the buyer to the seller, as such destination.    Cross on Liens, 736, 737.

" 3.  The coal was certainly in possession of Frees & Mull, when it was taken to their wharf, and it may be said, that so even was the coal in the shutes under the special arrangement with the company for the use of their shutes for that coal.    The shutes, under that arrangement, were the same as the yard, so far as manual possession of the coal went.

" The question still recurs, what was the nature of that possession ?    That has been brought to your attention under number 2.

" 4.  That depends on the right to stop *in transitu*.    If Hecksher had that right to stop *in transitu*, that is, if the delivery to Frees & Mull, was not final, but a delivery *in transitu*, he may maintain his action of trespass against the sheriff for selling his goods; if he had not that right, the goods would not have been his, and his action would fail.

" 5.  This point goes to the foundation of this action.    We will not say that the action cannot be sustained.    The alleged right of stoppage cannot be defeated by any claim against the consignee, whether by process against the consignee, or the carriers' claim to a general lien for balance due him from consignee, for the seller's power of intercepting the goods is the older and preferable claim.

" 6.  This proposition is unquestionably true.    The case in 9 Harris goes to that extent, apparently, and, if it be not presumption in us to express satisfaction with a decision of the Supreme Court, as we think, most wisely.

" The question of fraud is put on the ground of fraudulent combination between Wright and Light, to get this coal from Hecksher, and into their possession, which, if it were so, would avoid the sale.    The single-handed rascality of Wright in knowing of his insolvency when he bought, and intending not to pay for the coal, if such be the fact, would not avoid the sale; there must have been an artifice intended and fitted to deceive Hecksher.

" 7.  Whether the right of stoppage *in transitu* be gone in this case or not, is for the jury to say, applying the law already given them to the facts of the case.

" If the jury should find for the plaintiff, either on the ground of fraud of Wright and Light, or that the coal was *in transitu* at the time of the levy, they will ascertain what quantity of coal was levied and sold, and give its value with interest from the sale.

" If the jury find against the plaintiff, on either ground of fraud or *transitus*, they will then ascertain how much coal was sold, that was not levied, and give its value and interest.

"To this charge the plaintiff and defendant excepted, and at the request of each party, the same was written out, sealed and filed."

The admission of evidence, to prove a fraudulent combination between Jacob Light and Jonathan Wright, to get Richard Hecksher's coal into their possession, to affect the sheriff, and the charge of the court, were the errors assigned.

*Smith,* for plaintiff in error.—The action was trespass against the sheriff, for taking and selling the plaintiff's coal, who had sold it to Wright. The sheriff justified under a judgment and execution in favor of *Light* v. *Wright,* in a court of competent jurisdiction. The judgment and execution were legal and valid, and in full force, at the time of the sale. The court permitted evidence to be given to show a fraudulent combination between Light and Wright. That the judgment and execution were fraudulent, and therefore did not justify the sheriff. Where a court has jurisdiction, it is sufficient to justify the officer executing its process; for the officer is not bound to examine into the validity of its proceedings, or the regularity of its process. *Warner* v. *Shed,* 10 Johns. 138; *Hill* v. *Bateman,* 1 Strange, 711; *Marshalseza's Case,* 10 Coke, 76. Where a judgment is vacated or set aside, trespass may then be brought against the plaintiff, but the sheriff who executed the execution is excused. *Turner* v. *Folgate,* 1 Levins, 95; *Perkin* v. *Proctor and Green,* 2 Wilson, 385; Buller, Nisi Prius, 84; opinion of Sergeant, J., in *Day* v. *Sharp,* 4 Wharton, 341.

*As to the charge of the court.*—Whatever Wright may have said, written, or done, there was no evidence to implicate Light in any fraud, or that had a tendency to prove him in combination with Wright, to defraud Hecksher.

The execution was a lien on all the personal property of defendant. 3 W. & S. 440. The *transitus* of the goods, and consequently the right of stoppage is determined by actual delivery to the vendee, or by circumstances which are equivalent thereto. 2 Kent, Com. 543; 7 Barr, 303. Rogers, J. It will continue until the place of delivery be, in fact, the end of the journey of the goods, and they have arrived to the possession or under the direction of the vendee himself. 2 Kent, Com. 544. If they were landed at the wharf, where the goods of the vendee were usually landed and kept, the *transitus* was at an end, and the right of stoppage gone. Ib.; *Wright* v. *Lawes,* 4 Esp. 82. For which a number of cases are cited. The point of inquiry is, whether the property is to be considered as still in its transit; for if it has once fairly arrived at its destination, so as to give the vendee the actual exercise of dominion and ownership over it, the right is gone. 2 Kent, Com. 545; *Wright* v. *Lawes,* 4 Esp.

[Pottinger *v.* Hecksher.]

82. This last case also shows, that a delivery at the vendee's place of abode, is not necessary; it is sufficient that he has exercised some act of ownership over the goods. A complete delivery of part of an entire parcel or cargo, terminates the *transitus*, and the vendor cannot stop the remainder. 2 Kent, Com. 545, 546; 2 H. Blackstone, 504; 4 Bos. & Pull. 69; 6 East, 627. A delivery of the key of the vendor's warehouse to the purchaser, or paying the vendor rent for the goods left in his warehouse, or lodging an order from the vendor, for delivery with the keeper of the warehouse; or delivering to the vendee a bill of parcels with an order on the storekeeper for delivery .of the goods. *Coates* v. *Railton*, 13 Eng. C. L. 223; 5 East, 184; *Hays* v. *Monille*, 2 Har. 48; 13 Eng. Com. L. 111; 7 Barr, 303; *Bolin* v. *Huffnagle*, 1 Rawle, 9; *Ellis* v. *Hunt*, 3 D. & E. 466.

*As to Hecksher's right to maintain his action of trespass against the sheriff.*—To maintain trespass, it is absolutely necessary that the plaintiff, whether the property be real or personal, must be in the actual possession, or have the right to immediate possession at the time of the trespass. *Ward* v. *Taylor*, 1 Barr, 238; *Corfield* v. *Coryell*, 4 Washington, C. C. 371; 1 Chitty, Plead. 167, 168; 3 Day, 498; 11 Johns. 385; 9 W. & S. 35; Gibson, C. J., citing *Ward* v. *McCauly*, 4 Term R. 490; 2 Campbell, 465; 3 Campbell, N. P. R. 186, 187; 8 Watts, 234, 235, Kennedy, J.; *Ward* v. *McCauly*, 4 Term R. 490.

It must be such a right as entitles the plaintiff to reduce the goods into his possession, when he pleases. *Putnam* v. *Wiley*, 8 Johns. 432; 8 S. & R. 515.

And though the goods are lost, or rescued from him, he is bound, and an action of debt lies against him by the plaintiff. 2 Lord Raym. 1075; 11 S. & R. 304. A *fieri facias* abates not by the plaintiff's death. 1 Salkeld, 322. The sheriff that began execution shall end it, though his office expires. 1 Id. 323; 2 Lord Raym. 1073. By the seizure, the property is divested out of the defendant. 1 Salkeld, 323; and the defendant is discharged from the debt. 1 Id. 323; 4 Watts, 124, Rogers, J.; 2 Lord Raym. 1072.

If after a seizure of goods on a *fi. fa.*, and before the sale of them, the plaintiff dies, this will not abate the execution, or entitle the defendant to restitution of the goods levied on. *Clerk* v. *Withers*, 2 Lord Raym. 1072.

After a levy on an execution, the sheriff has possession of the goods levied on, and may maintain trespass against any person who takes them away. *Wilbraham* v. *Snow*, 2 Saunders, R. 47; *Nagle* v. *Stroh*, 4 Watts, 124; opinion of Judge Rogers, *Provillo* v. *Tilford*, 6 Watts, 468; *Smith* v. *Smith and Murphy*, 9 Har. 367.

[*Pottinger v. Hecksher.*]

*Strong* and *Banks*, for defendants in error.—1. If the purchase of the coal was fraudulent, then neither the title of Hecksher, nor his possession, was ever divested, and trespass would lie.

2. If even the possession of Hecksher was divested, and his right to stop the goods *in transitu* remained, and he did stop them on the 7th of April, 1852, his possession was then restored; at all events, he had an immediate right of possession, which was sufficient to enable him to maintain trespass.

These were facts to be found by the jury. How could the court say trespass would not lie? That the sheriff had levied on the 2d.of April, before the coal was stopped *in transitu*, on the 7th, is immaterial. The right of stoppage is superior to any lien of any third party against the purchaser. It is anterior and paramount to it. 2 Kent, Com. 541, 2d ed.; *Merrel* v. *Rankin*, 1 Bald. 528; *Hays* v. *Mouille*, 2 Har. 48; *Lelar* v. *Brome*, 2 H. 217; *Gibbs* v. *Chase*, 10 Mass. 128; 1 Met. 31; 5 Cow. 735; *Wintringham* v. *Lafoy*, 8 Wend. 610; Cross on Liens, 372-377; 2 Kent, Com. 540, *et seq.*; *Whitehead* v. *Anderson*, 9 Mees. & W. 534; 15 Wend. 137; *Naylor* v. *Dennie*, 8 Pick. 198.

*Covell* v. *Hitchcock*, 23 Wend. 611. "The right of stoppage continues while the goods remain in the hands of a warehouseman, *though at the place to which they were directed to be sent, if that be an intermediate point between the place of sale and the ultimate destination of the goods.*" 20 Wend. 167; 5 Denio, 629; *Bell* v. *Moss*, 5 Wharton, 189; *Donath* v. *Bloomfield*, 7 Barr, 301; *Allen* v. *Mercein*, 1 Ash. 103.

The opinion of the court was delivered August 14th, 1855, by

LOWRIE, J.—This cause was so thoroughly tried in the Common Pleas, and its principles are so fully and accurately presented in the charge of the learned president of that court, that we can scarcely speak of the points discussed without repeating what was rightly said before the cause came here.

The sheriff's justification depended upon the validity of Wright's title; and very certainly, the fraud used by him in trying to get it was an important test of its validity. The conspiracy between Wright and Light did not affect the judgment given by one to the other, but it helped to make out the fraud of Wright in his bargain with Hecksher. The judgment and execution remain valid, but they give no authority to seize Hecksher's property, and therefore were no lien upon it.

There is some room for a difference of opinion upon the facts that raise the question of the right of stoppage *in transitu*; but the principles on which the decision of the right was submitted to the jury, are entirely correct.

The finding of the jury on the foregoing points is, that the

[French v. Breidelman.]

title was still in Hecksher, and that Wright had not even a possession to justify the sheriff's seizure; and it follows, of course, that his seizure was a trespass.

Judgment affirmed.